MEMORANDUM OF DECISION
This is an action for termination of parental rights instituted by the Department of Children and Families (DCF) on August 14, 1995 at the Superior Court for Juvenile Matters in Rockville. The venue was subsequently transferred to the Child Protection Session for trial.
The file reflects that a neglect petition was filed against Joseph S., Sr. and Nakia M., who gave birth to the child Joseph Jr. on October 3, 1994. The file indicates that the mother, Nakia was born on July 25, 1979, and she was 14 years of age when she became pregnant. The petition alleges that the child's father, Joseph Sr. was born on April 9, 1973, and he was 21 years of age at the time of the child's birth. The petition was filed fourteen days after the birth of the child. An order of temporary custody was entered after a 96-hour hold had been invoked by the Department of Children and Families (DCF). The child had been removed from the mother when the child was ten days old. On January 13, 1995 the court (Goldstein, J.) entered a finding of neglect. The child has been in foster care with the same foster family since the child was ten days old. The petition for termination of parental rights alleges that the mother and father have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, that they could assume a responsible position in the life of the child.
All necessary parties were served and ably represented during the three days of trial. Nakia, now 16 years of age, was in attendance at trial with an infant in her lap every day of the trial. The child remained remarkably quiet with a pacifier or CT Page 5495-UUU bottle in her mouth most of the time. The second day of trial, Nakia divulged that the child was not hers, that she was babysitting for the child. The child's mother worked at a local fast-food burger restaurant. Nakia indicated she takes care of the child all week. She did not know the child's last name. Nakia also appeared pregnant and is to deliver "in about a month." She testified that the father of the child in utero is Joshua W., who is 19 years of age and presently incarcerated. She does not know his release date since "we stopped speaking when he found out I was pregnant . . . he's got two other children."
Joseph S., Sr. was also in attendance each day and was very ably represented by counsel. He is now 22 years of age and has just been released from nearly two years of incarceration into a half-way house where he has been residing for the past month. Joseph appeared during his testimony with a very sincere, soft spoken and affable affect, which, the court finds, belies his very casual acquaintance with the truth. It did not appear that Joseph consciously wished to be deceitful, but rather that his responses always appeared to be designed with one purpose in mind: to tell the inquisitor whatever Joseph thought that they would like to hear, even if it was entirely untruthful. The court's analysis of Joseph's demeanor and credibility is reinforced by many of the findings of Dr. David Mantell, the court-appointed psychologist who conducted two separate evaluations on the parents. In Dr. Mantell's first report, dated December 8, 1994, made only two months after the child's birth, he states that "Joseph S. was pleasant and cooperative during the evaluation. He smiled a lot and I had some questions about the reliability of his report." Dr. Mantell had good reason to be doubtful since the self-reported history of Joseph's relationship with Nakia, which Joseph gave to Dr. Mantell, was considerably at variance with the history elicited from him on cross-examination under oath. The court finds Nakia's history of their conduct and relationship to be much more truthful. The court also finds Joseph's testimony as to his own conduct, past, present and projected, as well as his historical relationship with Nakia, to be extremely suspect.
Dr. Mantell further reported: "The father suggested that the State hears that the mother might try to take the child (away from the foster placement). He pointed out that his own mother lost custody of all her children (including him) . . . and he believes it's unfair that his mother has more access to her children than he has to his own even though his mother is facing CT Page 5495-VVV more serious charges."
With respect to Nakia Dr. Mantell reports: "According to Nakia, she has an older sister, Adena R. Their mother is Rita S., whose name Nakia does not know how to spell. She said she never did and can't. Rena R. is her maternal grandmother. Her mother had been living in Manchester but was recently evicted for having no income. Nakia and her sister, Adena, have different paternities. She only knows the first name of her sister's father. . . . Nakia said she was in placement in 1992 or 1993 when her mother married her stepfather. . . . Nakia reports that her sister has two out-of-wedlock children and that her sister and her sister's children live with the grandmother, Rena R." During her testimony in court, Nakia said she and her sister and her sister's two children are living on their own, applying for state assistance and looking for another apartment. As earlier indicated, Nakia is about eight months pregnant by an incarcerated man who has no interest in her or the pregnancy.
The court finds that both Nakia and Joseph represent cross-generational parental failures. The court must decide by clear and convincing evidence whether the parents have achieved a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child Joseph, that they could assume a responsible position in the life of the child. The court concludes that neither parent has demonstrated the necessary degree of personal rehabilitation.
The court has heard the testimony of Dr. Mantell and has read and carefully considered his two reports. The court places great credence in the psychosocial history and findings of Dr. Mantell. The court has reviewed and considered fully the social studies of the petitioner, DCF, and the documents placed in evidence by the respondent father, especially those relevant to, and generated during his incarceration. In the respondent's testimony and confirmed by the exhibits offered into evidence by the father, he devotes much of his attention at trial to the lack of available classes at the correctional centers, to the conditions, duration and frequency of DCF-supported visitation and his willingness to comply with any court-ordered or DCF-imposed expectations. What is noticeably absent from his testimony and his planning is any personal acceptance of responsibility for his situation and similarly, any realistic assessment of his environment, his personal capabilities and his own limitations. An example is that his plan, depending upon who was asking the question, for the CT Page 5495-WWW care of the child Joseph, whom he admits views him as a stranger, is to work at his job, to put a roof over his son's head, to attend GED classes, to attend "parental" classes, and to be the single parent of Joseph. He admits that he can get virtually no child care support from his family ("I can't go to my mother's, she's in jail"), and will put his son in day-care as his only help. He also has no car and no driver's license at age 22. He hopes to be released from the half-way house in December 1996. When questioned by another examiner, Joseph states that Nakia is adequate to be the child's single parent, and under yet another scenario he and Nakia will be reunited and parent together. He and Nakia have seen each other three times in the past month while he has been in the half-way house. Nakia testifies that she doesn't want anything to do with him, he had hit her when they lived together, she was once hospitalized following an assault, she's presently pregnant by another man, and she believes it likely that Joseph will return to selling drugs. Her plan is to continue to live with her sister and her sister's (now) three children, and support herself, her soon-to-be born infant and Joseph by baby-sitting, supplemented by State assistance.
With respect to Joseph's complaints about the lack of classes for him in the multitude of correctional centers to which he was assigned and for DCF's perceived insensitivity to Joseph's new-found strong parental desire for visitation, he is equally unaware of reality. In one of the exhibits which he offered (Respondent's Exhibit E), the acting warden responding to one of Joseph's "Inmate Request" replies: "Unfortunately, the reality of jail is that you must serve your time in a setting where you are away from your family. Situations become strained as a result of this and problems develop. . . ."
With respect to his interest in visitation, Joseph testified that he saw his son "every other day" during the ten day period that the infant was with Nakia before DCF removed the child. The court finds that the more credible testimony was that Joseph was estranged from Nakia during this period, he was romantically involved with another 16 year old female child whom he was using to help him sell drugs, and that he did not see his child even once outside of the hospital. His claim that he saw the child two or three times at DCF-arranged visitation in the two months subsequent to the child's birth and to his own incarceration must be evaluated in light of his other distortions. What is very likely is that during this child Joseph Jr.'s young life, the father has seen the child on no more than two or three occasions CT Page 5495-XXX when the child wasn't brought to him in jail. He exercised only the most minimal interest in the child at all and never supported the child or the mother during her pregnancy and hospitalization, notwithstanding his (very likely) high, illicit earnings from drug trafficking which he admits to doing ever since he was 18. Nonetheless, Joseph considers himself a suitable candidate to raise a child that is comfortably situated and bonded in foster care.
Again, the reality for Joseph S., Sr. is that he has not taken parenting classes, personal counseling, or completed requirements for a General Equivalency Degree. He is no different today than he was when Dr. Mantell found him to be ". . . a pleasant, cooperative, soft speaking, immature, and impractical man with poor judgment and a psychosocial history dominated by drug culture problems and limited capacity." Petitioner's Exhibit # 2, page 2. The court finds him to be neither credible nor reality-oriented.
Nakia, while generally a more reliable reporter of her own history, is equally unprepared for parenthood. She reports to a tenth grade education, but even this is greatly overstated as a true measure of her academic achievement. She reads at a third grade level. She really was expelled from classes where she had been enrolled in the tenth grade of special education classes. She had gone to school no more than six days out of forty-four before she was expelled in the fall of 1995. Joan Lingard, school social worker for Bennett Middle School, testified to the extensive, personally planned efforts to have Nakia do very specifically individualized, independent living skills, to be tutored in her home. The skills, such as making baby blankets, regrettably could not hold Nakia's waning attention. She was easily distracted and more interested in her new boyfriend and his criminal problems. The central Planning and Placement Team (PPT) arranged for Nakia to go to a regional academy for socially and emotionally maladjusted children. She went for two days and never returned.
Nakia has a significant psychosocial history of transient life style, multiple placements between her mother, her grandmother and DCF. Her mother has never been a stable, nurturing resource for Nakia. Her mother complained to DCF about the grandmother with whom Nakia had lived since age 3, and for whom Nakia had genuine affection. The complaints that the grandmother was unable to protect Nakia from the sexual advances CT Page 5495-YYY of older men resulted in Nakia's commitment to DCF in January 1991. She was in various placements, foster homes, shelters, and hospitals, including Mt. Sinai's ABC unit, and a thirty day evaluation at Riverview. She ultimately ran away and was beyond DCF's control. She returned to her mother's care, such as it was, refusing DCF assistance. The commitment expired on January 31, 1994, the same month she became pregnant at age 14 with Joseph Jr.
Nakia admits to sexual activity since she was age 10 and estimates ten different sexual partners. She admits to pregnancies by Joseph S., Sr., Tyrell B., Ricardo J., and a fourth pregnancy by a man she would not disclose to Dr. Mantell. Her present, fifth pregnancy is by Joshua W., who, as reported, is incarcerated and estranged from Nakia. She is believed to have had only one live birth, Joseph, Jr.
The record of testimony, social studies and exhibits are replete with the efforts of DCF, the Family Support and Resource Center, caseworkers and school authorities to get Nakia to attend school, parenting classes, and visitation opportunities. Nakia persistently resisted efforts to help herself gain education and skills to become an effective parent. Even prior to removal of the child, DCF made efforts to suggest placements that would have kept the parent and child together. Those recommendations included the St. Agnes home for unwed mothers. They offered to have her live with her mother and use a parent aid. Nakia did not want to live with her mother, whom she referred to as a "basehead." Her idea of effective parenting was to live with Joseph, whom she knew to be selling drugs, in a house known in the community as a drug house. DCF moved quickly and appropriately to remove the child from that environment.
In the weeks and months that followed, Joseph and Nakia made three out of twelve scheduled visits. After Joseph's incarceration, Nakia made three out of eight visits in January and February. Her visits dropped off dramatically after that to the point that Dr. Mantell recommended stopping visits altogether in is report of February 26, 1996. The DCF made a decision at that time to stop all visits since they were having a harmful effect on the child; mother had failed to maintain anything resembling a stable home environment, having at least five addresses in the preceding twelve months; she was not attending school; she was not going to parenting classes; she had failed to obtain regular employment; and she was uncooperative with the CT Page 5495-ZZZ Family Support Resource Center, Manchester school authorities, and DCF. Dr. Mantell concluded: "I recommend no visitation with the child as my own observation and the parental reports indicate that visitation seriously distresses the child when it occurs and some time afterwards. There is no room here for rehabilitation recommendations on account of the mental status of both parents who perceive themselves respectively as having no limitations or problems amenable to treatment." He further concluded that both parents were unprepared and unfit as parents and recommended the child remain in foster home until a permanent home can be found.
ADJUDICATION
Based upon the preliminary findings, the court concludes by clear and convincing evidence that this child Joseph S., Jr. has been found in a prior court proceeding to have been neglected. The court further finds that Nakia M. and Joseph S., Sr. have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child.
MANDATORY FINDINGS
Having found that grounds exist for the termination of the parental rights, the court must analyze and make findings pursuant to General Statute § 17a-112 (d), as amended, and determine whether the termination of parental rights is in the best interest of the child. The court makes the following seven factual findings required by § 17a-112 (d):
1. Regarding the nature and timeliness of services offered by the Department of Children and Families: The court finds the Department rendered or offered the services previously described above, as did other agencies offer services described in Section 11 of the Social Study dated July 28, 1995. The parents did not avail themselves of the services. The Department offered case management services and visitation assistance as previously described.
2. Regarding DCF's efforts for reunification pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended, and § 17a-112 (d) of the General Statutes:
The court finds that the Department of Children and Families CT Page 5495-AAAA made reasonable efforts given the situation and circumstances to assist the family prior to removal, which were rejected by Nakia. The court finds that DCF acted at all times in accordance with federal and state law. The many services offered Nakia subsequent to removal were unavailing. The criminal activities of the father together with his intellectual limitations, his lack of insight into his past, present and projected circumstances make unification, since there was no prior relationship, a futile possibility
3. Regarding court orders, fulfillment of obligations, expectations and service agreements: The Department, with the approval of the court, set reasonable and realistic expectations to reunify the family. There was only minimal compliance, if any, by the mother. There was virtually no participation by the father. For the reasons found by Dr. Mantell, and as stated in paragraph 2 infra, expectations of any kind which anticipate substantial improvement in their parental skills would be wholly unrealistic.
4. Regarding significant emotional ties of the child toward parents, relatives, foster parents, etc.: The child has strong emotional ties with the foster family that has provided the physical, emotional, moral and educational support this child needs. The child has no positive emotional ties to the biological parents, as the child was removed from the mother ten days following the child's birth, and her visits with the child were infrequent and irregular. The father went with the mother for three visits. Joseph did not go to any visits by himself prior to his incarceration. He went to three visits with Nakia and saw Joseph, Jr. approximately five times during the past nearly two years.
5. Findings regarding the age of the child: The court has considered that the child is 2 years old and has lived in the present placement for virtually all his young life. He identifies his foster family as the only family he has known, he is well adjusted and bonded closely to this family. The foster family intends to act as an adoptive home resource. For Joseph to wait for his biological parents to rehabilitate themselves would be speculative at best and very unlikely to occur in the near future. Jeopardizing this child by contemplating a possible future placement where the child would be immediately imperiled is an experiment the court is unwilling to consider. CT Page 5495-BBBB
6. Regarding the parents efforts to conform their conduct to the best interests of the child considering: contact, conduct, communications and contributions, if any. The parents have not made realistic or sustained efforts to conform their conduct to even minimally acceptable parental standards. In re JuvenileAppeal (Docket No. 9489), 183 Conn. 11, 15 (1981). Giving them additional time, given their personal and parental limitations, would not be prudent, nor in the child's best interest. In reLuis C. 210 Conn. 157 (1989).
7. Acts preventing meaningful relationship with the child by any person, foster parent, agency etc. While the mother's means were limited, economic or geographic factors did not prevent regular, continuing contact with the child or the foster family. The principle limiting factor, was and is, the mother's inability or unwillingness to avail herself of the educational and parenting programs which have been individualized and offered to her, together with her unstable personal existence. There is nothing in the record, including geographical, economic or institutional conduct or circumstances, to suggest that these parents have been prevented from maintaining or establishing a meaningful relationship with the child, except the father's incarceration. If he had been actively working with mother and child prior to his incarceration, had developed some bonding with the child, and had given up his illegal drug activity prior to the child's birth, the court would be more inclined to believe the father's laments from jail that he has been deprived of a relationship with his son by heartless and insensitive bureaucrats at DCF and the Department of Corrections. To paraphrase on an old saw, although one may sympathize with the position in which the [respondent] finds himself, the fact remains that by his [criminal conduct] he made his bed and he cannot now be heard to complain. McAnerney v. McAnerney,165 Conn. 277, 287 (1973).
ORDER
The court having considered all statutory considerations, and having found by clear and convincing evidence that grounds exist for termination of parental rights, further finds upon all of the facts and circumstances presented, that it is in the child's best interest to terminate the parental rights of Nakia M. and Joseph S., Sr. Accordingly, it is ordered that the parental rights of the biological parents to the child Joseph S., Jr. are hereby terminated. CT Page 5495-CCCC
It is further ordered that the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for the purpose of securing an adoptive family or other permanent placement for said child and that the Commissioner shall file with the court, no later than ninety (90) days following the date of judgement, a written report toward such permanent placements and file such further reports as are required by state and federal law.
F.J. Foley, Judge